GARDNER D. MATTHEWSON, Plaintiff, ALBERT BOWEN, Intervenor, Appellants, v. W. E. FAHNESTOCK et al., Appellees.

No. 42051.

DECEMBER 12, 1933.

George H. Mayne, D. E. Whitfield, and J. A. Singhaus, for appellants.

W. H. Hopewell, and Genung & Genung and Cook & Cook, for appellees.

EVANS, J.—The grounds of contest alleged in the petition were: (1) Want of mental capacity; and (2) undue influence exercised by the beneficiaries of the will. It was also averred that Roy Bowen sustained confidential relations with the testator, and that he obtained the execution of the will under cover of such fiduciary relation.

The intervenor, Albert Bowen, joined in the averments of the

petition, and further averred on behalf of himself that the real property devised by the will was acquired by the testator from his parents under an agreement whereby the testator agreed to convey to the said Albert Bowen a half interest in said real estate in event that said Albert Bowen should return to the state of Iowa; and that, as a protection to said Albert Bowen in event of the death of Sam Bowen, Sam would execute a will devising all of such property to the said Albert. These averments of the petition of intervention furnish the only information in the record concerning the intervenor. He did not testify on the trial, nor, according to the briefs, did he appear at the trial. One of the contentions of the appellants is that the will was unnatural and unreasonable. No proof was directed to that allegation so far as Albert was concerned, other than that he was a brother.

The real property owned by the testator was a farm of 320 acres situated in Burt county, Neb., and another farm of 80 acres located in Mills county, Iowa. The amount of personal property in the estate was not disclosed at the trial.

The concrete case presented by the appellants was that Sam Bowen was a drunkard and that he had been such for the last forty years. The particular cause and circumstances of his death are not disclosed in the record. Its implications, however, are that he died suddenly of heart trouble, and that he had received admonition of such heart trouble some days before his death. The evidence discloses without dispute that the testator was addicted to drink and had been so for many years; that he was frequently drunk, and frequently sober. The burden resting upon the appellants was to show that he had thereby lost his testamentary capacity as of the time that the will was made. No evidence of undue influence by the beneficiaries of the will was offered. Evidence was offered of the friendly relations between Roy Bowen and the decedent, and that such relations had continued for many years; that Roy Bowen for many years looked after the Nebraska farm as an agent for the decedent. Roy was at the home of the decedent on the date that the will was executed. This was on Tuesday, July 21. He had come there from Nebraska at the express request of the decedent. A letter from the decedent dated July 14 was in part to the following effect: "Can't you come down and see me? I am not feeling well." Responsive to that letter, Roy Bowen came on Sunday, July 19, and remained with the decedent until he died on the following Wednesday. Paul

Richardson was not present, and had no knowledge of the execution of the will. One of the obligations imposed upon him by the will was to take care of the dog "Fannie". Prior to that time Paul had farmed a few acres of the Mills county farm of the decedent. It appears from the record that the relatives of the decedent, other than Roy Bowen, were distant and indifferent in their relations with the decedent. Some of them lived near to him, but seldom saw him, and never visited him. His home was that of a bachelor. It was not attractive. Neither was his personality. Cleanliness was not emphasized in either respect.

The larger volume of evidence offered by the appellants on the trial concerned the habits of the decedent twenty, thirty, and forty years ago. This evidence was largely rejected by the trial court as being too remote. No evidence was offered of the immediate circumstances attending the making of the will. The scrivener and the attending physician were both present at the time of the execution of the will, and subscribed thereto as witnesses. They were wholly disinterested. They were not called as witnesses by the appellants. Roy Bowen was at the home, but was out in the yard at the time of the execution of the will. The evidence offered by the appellants, which had the nearest approach to the issue tendered by the appellants, was that of the witnesses Ostrander and George Bowen. We set forth so much of the testimony of these witnesses as present its most favorable aspects to the appellants.

Ostrander had been a tenant of the testator and had known him for many years. He testified as follows:

"I was at his place Sunday before he died and was there on Thursday, Friday and Saturday before. I went there Thursday because I had missed him going to town and had an idea he was drinking and went over there to see how he was going along. When I got over there he was lying in bed drunk. He was able to recognize me. I stayed over there 2 hours. I went over again Friday morning and was there about the same time. I got him a little breakfast and made him some coffee. His condition as to intoxication wasn't very good that day only he wasn't as drunk as he was on the day before. I was over there again Saturday about two o'clock, about an hour or two hours. He had sobered up quite a bit Saturday and I don't think he had drunk anything since Friday. He wasn't feeling well and wanted me to phone and have a doctor come

out and see him and I phoned Doctor Christy, Saturday evening. I was over there again Sunday morning and Roy Bowen and his boy was there. Sam was up and walking around. He had me draw him some gasoline and take it down to the cellar to put it in his engine and he went down and started up the engine after I put the gas in. I didn't notice any intoxicating liquor there Sunday morning but he had it there Thursday, Friday and Saturday. He had some in the cellar and he had some setting by the side of the wall by his bed. It looked to me like there was about the same amount of whiskey in the bottle by the bed as there was the night before.  *  *  *

"Sunday morning he got up and walked around as good as anybody. The other days he wabbled around quite a bit when he got up. Staggered. He was nervous and shaky and his hands trembled. His feet were swollen quite a little. I noticed that because he wanted me to hunt up his carpet slippers so he could put them on. He didn't want to put on his shoes. He breathed short and quick. When I was there the Friday before he died he asked me to look and see whether any of his liquor had been stolen or not. He asked me to look down the cellar in a cave. I went down there and found a box with six quarts of liquor in it. I don't know whether it was alcohol or whiskey. I didn't taste it. Roy told me that Sam wrote him and wanted him to come down. Prior to that time Sam told me that Roy looked after his property up there in Nebraska. Sam hadn't said anything to me about Roy coming down.

"Prior to the time I have testified to, Sam had been on a previous drunk in April which continued about a week or ten days. In April during the time of that spree I wasn't there very much because I was busy and Jim Maline was staying there with him. He had a doctor attending him at that time. I don't remember how many times the doctor was out there but he had a bad spell. Usually he was up and around after a drinking bout after he got over the drunk except when he had that bad spell and then it was a couple of days before he was out again. Before the time in April when he was on a drunk he was on a drunk every once in a while and during these times he most always called the doctor at about the time he got ready to sober up.  *  *  *

"When he would call the doctor he was short of breath, as far as I know. There were times when he was more nervous than others. Had nervous spells worse than others which would last a day sometimes and sometimes two or three days. During these spells the

doctor would come from one to two or three times. I observed him taking medicine after the doctor would make these calls and have repeatedly seen the medicine in the house and I have gone down and got it for him. I have never known of Sam transacting any business when on one of his drunken sprees. No one could ever get him to do any business when he was drunk. I did not see Sam drunk between April and the Thursday before he died. He was that way. Sometimes he would be drunk once a month and sometimes he would go two months. I never knew him to get drunk twice a month.

"Cross-examination.

" * * * He took care of his own affairs. I never had any trouble in my business with him and he was of course able to handle his business. He figured up the business between us himself and made the settlement. I couldn't tell how many settlements I had with him. I rented the place on the halves and shucked the corn and hauled it to him. The first year I was there he hired me to put in five or six acres of hay. The last settlement I made with him was the fall before he died, about the middle of December. I re-rented the place in March sometime and I went down with Paul Richardson to see if it would be all right with Sam to let Paul put in part of the corn ground. I was to give a half of the crop and I talked that over with Sam. Sam said he thought there was 13 or 14 or 15 acres. In March was the last business relation I had with him. When I saw him the Thursday before he died he was drunk. On Friday he was still drunk but not as drunk as the day before. On Saturday he was sobering up. On Sunday he was sober. The last time before Thursday that I saw him was when he passed on the road Monday but I was not close to him and did not talk to him. I did not see him Tuesday or Wednesday and so went over on Thursday. Roy Bowen was not there until Sunday morning. I talked with Sam and Roy Sunday morning. Sam asked me to get some gasoline and he started the engine. He was able to go down in the basement."

George Bowen, a cousin of the decedent, testified as follows:

"During the time I have known Sam I have seen him drink frequently. Have seen him drink a good many times. When he got that way he would stay drunk two or three days, some times maybe it would not be that long. Usually I saw him drunk at home but

have seen him at Hastings and some other places when he was drinking. The last time I saw Sam was the Sunday afternoon before he died at his home. I went over there to see him. He was in bed. He was sitting on the bed. I think he had been drinking a little, I don't know whether you would call him drunk. It seemed he didn't want to see me. He just got up off the bed and went out. He went out and left me. He didn't look just right. I kind of felt he was drinking but couldn't say for sure. I didn't see any bottles around the bed. I spoke to him and a second of time passed before he answered me and he got up. I asked him how he felt and he said he felt tough, and he got up and went out and left me sitting in the room alone. He went into another room. I couldn't say I saw him in the other room but I heard somebody in there but couldn't say whether it was him or not. After he left me I stayed in the room a few minutes, waited a while and he didn't come in and I got up and went out and didn't see him again before I went away.

"Roy Bowen and his little boy were there and another man out in the car that I didn't know. I saw Sam three or four days before that Sunday over at his house. He seemed to be sober then. I didn't see him again after that Sunday, before he died. I didn't go back there any more and nobody sent word to me about his being sick or worse between Sunday and the time he died. I didn't get any word from Roy about him."

No offered evidence was directed to the immediate issue more definitely than that above set forth. Manifestly it was insufficient to establish the averment of mental incapacity. It was equally insufficient to establish the averment of undue influence. It necessarily follows that the order of the court directing a verdict for the defendants was a proper one.

It is accordingly affirmed.

ALBERT, C. J., and KINDIG, CLAUSSEN, and DONEGAN, JJ., concur.